UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| SCOTT W. DAVIS, | ) | |
|---|---|---|
| | ) | Case No. 3:22-cv-160 |
| *Plaintiff*, | ) | |
| | ) | Judge Travis R. McDonough |
| v. | ) | |
| | ) | Magistrate Judge Jill E. McCook |
| JAMES DUDLEY, JR. and PAYTON KING, | ) | |
| | ) | |
| | ) | |
| *Defendants*. | | |

## MEMORANDUM OPINION

Before the Court is Defendants James Dudley, Jr., and Payton King's motion to dismiss. (Doc. 21.) For the following reasons, the Court will **DISMISS** this action **WITHOUT PREJUDICE**.

### I. BACKGROUND

On December 3, 2020, process servers served Plaintiff Scott W. Davis and his wife Hope Davis at their home with a summons for a civil suit. (Doc. 15, at 2.) After serving them, the process servers remained in the Davises' driveway and left only after Mr. Davis confronted them. (*Id*.) According to Mr. Davis, however, he feared that the process servers "might return to threaten them or cause them harm." (*Id*.) Sometime after serving the Davises, the process servers contacted the Knox County Sheriff's Office, which dispatched Officers Dudley and King to investigate.[1] (*Id*. at 3.) One of the process servers later reported to Dudley and King that Mr.

---

[1] Dudley and King's bodycams recorded the incident. (*See* Doc. 20.) The Court may consider the bodycam videos in connection with Dudley and King's motion for to dismiss without converting it to a motion for summary judgment. *See Bell v. City of Southfield*, 37 F.4th 362, 64

Davis punched her and her dog while they were in their car in his driveway. (Dudley Video, at 2:32–3:29.[2])

Dudley and King then went to the Davises' residence to investigate. (*Id*. at 14:02.) According to Mr. Davis, he noticed brake lights from two vehicles pulling into his driveway. (Doc. 15, at 3.) He did not recognize the vehicles, because it was dark, but believed that it was the process servers returning. (*Id*.) At this point, Mrs. Davis went to the bedroom and locked the door. (*Id*.) Mr. Davis went to another room in the house to retrieve a shotgun and then went to his kitchen. (*Id*.) From there, Mr. Davis observed a man wearing dark clothes and a beanie outside his home, who turned out to be Dudley. (*Id*. at 4.) Upon seeing Mr. Davis holding a shotgun, Dudley, from outside of the home, ordered: "Drop that. Sheriff's office, drop that gun." (*Id*.; Dudley Video, at 14:36.) Mr. Davis claims that he could not hear Dudley over the music playing inside his house and did not hear him say that he was from the Sheriff's office. (Doc. 15, at 5.) At this point, Dudley retreated from the door, drew his pistol, and went behind his car parked in the driveway, all while repeatedly telling Mr. Davis to "drop the gun." (*Id*.; Dudley Video, at 14:43.) Mr. Davis then came to the door with his shotgun pointed upward and opened the door to ask: "What are you doing here?" (Doc. 15, at 5; Dudley Video, at 14:50) Dudley, with his pistol aimed at Mr. Davis, responded: "I am here to talk to you. Drop the gun." (Dudley Video, at 14:51.) In response, Mr. Davis told Dudley that he should "drop his fucking gun" because they were on his property. (Doc. 15, at 5; Dudley Video, at 14:52.) While Dudley

---

(6th Cir. 2022); *Bailey v. City of Ann Arbor*, 860 F.3d 382, 386–87 (6th Cir. 2017). Use of the videos, however, is "limited." *Bell*, 37 F.4th at 364. To the extent there are factual disputes between the parties, the Court may "only rely on the videos over the complaint to the degree the videos are clear and 'blatantly contradict' or 'utterly discredit' the plaintiff's version of the events." *Id*. (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)).

[2] King's bodycam video also captured their interaction with Mr. Davis. Because King's video is consistent with video captured by Dudley's bodycam, the Court will primarily rely on Dudley's bodycam video in describing their interaction with Mr. Davis.

continued to instruct Mr. Davis to drop his gun, King also shouted "Drop the gun" and "we just want to talk to you." (Dudley Video, at 14:55–15:00.) King, with her pistol drawn, then began moving closer to Mr. Davis. (*Id.*; Doc. 15, at 5.) According to Mr. Davis, at this point, he noticed Dudley's uniform and asked if they were with the Sheriff's office. (Doc. 15, at 6; Dudley Video, at 15:08.) When Dudley and King responded that they were with the Sheriff's office, Mr. Davis placed the shotgun inside his home (Dudley Video, at 15:16) in an upward position out of his reach. (Doc. 15, at 5–6.) He then grabbed his cell phone, and said "alright mother fuckers, I'll call Tommy," referring to Knox County Sheriff Tom Spangler, whom he alleges he knew personally. (*Id*. at 6; Dudley Video, at 15:18.) Mr. Davis also raised his hands in an attempt to show that he was unarmed and that he was only holding his cell phone, but he also told Dudley and King, "fuck you, I don't have to do anything" in response to their commands to "step out." (Doc. 15 at 6; Dudley Video, at 15:31.) Dudley and King continued to aim their pistols at him, and he urged Dudley and King to "shoot me." (Doc. 15, at 6; Dudley Video, at 15:33.)

While Mr. Davis was on the phone attempting to contact Sheriff Spangler, King holstered her pistol and drew her taser. (Doc. 15, at 7.) Dudley also repeatedly implored Mr. Davis to "step away from the gun." (Dudley Video, at 15:41–16:15.) Mr. Davis alleges that while he was on the steps outside the door, his shotgun was not in his reach. (Doc. 15, at 7.) During this time, Mr. Davis repeatedly told Dudley and King to "shut up" and that he did not have to do what they told him because they were on his property. (Dudley Video, at 16:15–16:52.) Upon failing to reach Sheriff Spangler, Mr. Davis raised his arms into the air. (*Id*.) Dudley repeatedly instructed him to step down from his steps and away from his gun. (*Id*. at 16:52–17:15.) Then, while approaching him, Dudley holstered his pistol. (*Id*. at 17:18.) Dudley and King grabbed him and

3

moved him toward a vehicle parked in his driveway. (*Id*. at 17:19.) At this point, they tried to gain control of Mr. Davis's hands and arms, but a struggle ensued, and Dudley ordered him to get "on the ground now" and "give me your hands or you are going to get tased." (*Id*. at 17:21–17:32.) Dudley and King then tackled him and took him to the ground. (*Id*. at 17:33–17:40.) Dudley and King demanded that he give them his hands, and he responded, "both hands are here." (*Id*. at 17:50; Doc. 15, at 7.) Dudley and King then handcuffed him and placed him in a patrol vehicle. (Doc. 15, at 7.)

According to Mr. Davis, Dudley and King then began to construct a "false narrative" about what happened. (*Id*. at 8.) Dudley asked King to walk him through what happened and told King that "he came to the door with a loaded shotgun and refused to drop it." (Dudley Video, at 29:46.) King responded that, "he saw us, shut the door, and went in to get his gun and came back out." (*Id*. at 29:52.) Dudley, in a telephone conversation on the scene, stated his account of what happened:

> [W]e came, announced ourselves, he went inside and retrieved his shotgun, came to the door, refused all verbal commands; we finally got him to set the shotgun down and he said 'I'm calling Spanky right now' and got on the phone; called Spanky or somebody; went to voicemail; I got him to drop the gun; Payton [King] went less lethal . . . we told him he was going to be tased if he didn't step away from the gun and we used force to get him on the ground and detained him. Before that, though, it was a civil-process server that came up here that's suing his construction company and he 94'd her and their dog. She's got some marks around her eye and I documented that with . . . the picture app and we was going to do the report for simple assault and you know obviously it's a misdemeanor that didn't occur in our presence and gave them the report number and let them go talk to the magistrate, so, but then we go up here to make contact and all this happened, so . . . .

(*Id*. at 30:19.) After listening to the other person on the phone, which is inaudible from Dudley's bodycam video, Dudley stated "I was thinking ag assault – weapon." (*Id*. at 31:47.)

Another officer, possibly a captain in the Knox County Sheriff's Department, then arrived at the Davises' residence. (*Id*. at 34:48.) Dudley told the officer that he had unloaded the

shotgun, which had been loaded during the officers' interaction with Mr. Davis. (*Id*. at 34:54.) King then reported to the officer: "he saw us walking, he saw our cars pull up, he saw us get out, was out here, went in, locked the door, came back with a shotgun." (*Id*. at 35:10.)

Dudley then called an "on-duty magistrate" to "run something by [him]." (*Id*. at 36:00.) Dudley then recounted the following, among other things, to the magistrate:

> We parked our vehicles; he sees us pull up; he gets out; we announce, "Knox County Sheriff's Office"; he comes back with a loaded shotgun with five rounds in it; refuses to drop the weapon; we've announced ourselves several times; made our presence known; he refuses to drop the weapon; finally, after several moments, we get him to set the weapon down while he says, "I'm calling the sheriff," and he finally drops the weapon and we have to fight him to get him to the ground to get him restrained. I just want to make sure we're good on aggravated assault for the display of the weapon with us announcing ourselves . . . He's seen the police are here, and then he comes out with a shotgun refuses to drop it and tell us to get the fuck off of his property. . . . so he displayed the weapon and put us in fear of serious bodily harm or injury after we've announced ourselves as police.

(*Id*. at 37:30; Doc. 15, at 9–10.) The magistrate advised Dudley that Mr. Davis did not commit aggravated assault by standing in his doorway with a weapon asking "what are you doing on my property?" (Dudley Video, at 40:23; Doc. 15, at 9–10.) Dudley reiterated to the magistrate that he and King announced themselves several times and that Mr. Davis was unarmed when they first contacted him, which Mr. Davis disputes. (Dudley Video, at 41:03; Doc. 15, at 10.) Mr. Davis alleges that: (1) he did not know who was on his property; (2) Dudley and King did not announce themselves several times or make it known they were law-enforcement officers; and (3) he did not come outside his home with a loaded shotgun. (Doc. 15, at 9.) Mr. Davis further alleges that, although King was present for the phone call with the magistrate, she did nothing to correct Dudley's false statements. (*Id*.) The magistrate then informed Dudley that they should call the District Attorney's Office and indicated that, if the assistant district attorney approved, he would issue an arrest warrant. (*Id*.; Dudley Video, at 42:51.)

5

According to Mr. Davis, Dudley then made similar false statements to the District Attorney's Office:

> We come to the house to make contact with the suspect. We pull in the driveway, he sees us pull in, in marked units, [and] we're walking up; as we're walking up, we announce, "Knox County Sheriff's Office." He comes out, I guess sees us, he was unarmed, goes in, and we're announcing, "Knox County Sheriff's Office! Knox County Sheriff's Office!" and he comes out with a loaded shotgun. We identify ourselves as police numerous times, also while begging and pleading with him to drop the weapon. Several minutes go by. He finally complies with our orders to set the shotgun down while he states, "I'm calling the sheriff." He sets the shotgun down and we get him away from the gun . . .

(Doc. 15, at 10–11; Dudley Video, at 44:39–45:20.) King was present for this conversation, and Mr. Davis alleges she did nothing to correct Dudley's false statements. (Doc. 15, at 10–11.)

On December 4, 2020, two warrants were issued for Mr. Davis—one for aggravated assault in violation of Tennessee Code Annotated § 39-13-102, and one for resisting a stop, frisk, halt, arrest, or search (hereinafter, "resisting arrest") in violation of Tennessee Code Annotated § 39-16-602. (*Id*. at 12; Doc. 21-1; Doc. 21-2.) In seeking the warrants, Dudley submitted affidavits of complaint to the magistrate who issued the warrants. (Doc. 21-1, at 2; Doc. 21-2, at 2.) Mr. Davis alleges that these affidavits also included false statements about the incident, including falsely stating that he resisted arrest. (Doc. 15, at 12.) Specifically, with regard to the resisting-arrest warrant affidavit, Mr. Davis alleges that he did not pull his hands away from the officers and did not refuse to give his hands to the officers; rather, he attempted to comply with the officers' commands by repeatedly saying that "both hands are here." (*Id*.) According to Mr. Davis, there was no probable cause to arrest him, detain him, or commence a criminal prosecution against him based on this incident.[3] (*Id*. at 13.)

---

[3] Additionally, on December 23, 2020, one of the process servers who served the Davises on December 3, 2020, executed an affidavit of complaint, which caused warrants to be issued for Mr. Davis's arrest on simple misdemeanor charges. (*Id*. at 13.) Mr. Davis believes that the process server received assistance from King to complete the warrant process to make sure that

On January 19, 2022, the General Sessions Court for Anderson County, Tennessee, held a probable-cause hearing. (*Id*.) According to Mr. Davis, Dudley repeated false statements about the incident at the hearing. (*Id*.) After Dudley was confronted with video evidence on cross-examination showing that Mr. Davis did not come out of his house, that he did not know who was approaching his house, and that he did not come out with a loaded shotgun, the general sessions court judge dismissed the aggravated-assault charge against Mr. Davis for lack of probable cause. (*Id*.; Doc. 21-2, at 1.) The certified copy of the warrant for resisting arrest, however, indicates that the resisting-arrest charge was bound over to a grand jury.[4] (Doc. 21-1, at 1.)

Mr. Davis initiated the present action on May 9, 2022. (Doc. 1.) Based on the allegations in his amended complaint, he asserts claims against Dudley and King for: (1) malicious prosecution pursuant to 42 U.S.C. § 1983 for violation of his Fourth Amendment rights; and (2) malicious prosecution under Tennessee state law. (Doc. 15, at 15–16.) Although Dudley and King have moved to dismiss Mr. Davis's malicious-prosecution claims, arguing, among other things, that they are entitled to qualified immunity and that the body-cam videos demonstrate they did not make false statements in the warrant affidavits (Doc. 22, at 3-13), the Court finds that the more appropriate course of action at this time is to dismiss the case without

---

he could be arrested a second time. (*Id*.) On January 14, 2021, Mr. Davis was pulled over by a Knox County Sheriff's Office deputy and arrested. (*Id*.) King arrived on the scene after Mr. Davis was in handcuffs and was being escorted away from his truck, and she proceeded to search his truck. (*Id*. at 14.) Mr. Davis believes that the search was under the pretext of an inventory search and that the January 14, 2021 search and seizure was the result of Dudley and King's animosity toward him. (*Id*.)

[4] The Court can consider the certified copies of the arrest warrants without converting the motion to dismiss into a motion for summary judgment. *See Jones v. City of Cincinnati*, 521 F.3d 555, 562 (6th Cir. 2008) ("A court may consider public records without converting a Rule 12(b)(6) motion into a Rule 56 motion.").

prejudice pursuant to the abstention doctrine announced in *Younger v. Harris*, 401 U.S. 37 (1971).

## II. *YOUNGER* ABSTENTION STANDARD

Under the *Younger* doctrine, "when state proceedings are pending, principles of federalism dictate that the constitutional claims should be raised and decided in state court without interference by the federal courts." *Doscher v. Menifee Cir. Ct.*, 75 F. App'x 996, 997 (6th Cir. 2003). For *Younger* abstention to apply: "(1) there must be an ongoing state judicial proceeding; (2) the proceeding must implicate important state interests; and (3) there must be an adequate opportunity in the state proceeding to raise constitutional challenges." *Id.* (citing *Middlesex Cnty. Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 432 (1982); *Kelm v. Hyatt*, 44 F.3d 415, 419 (6th Cir. 1995). "[The Sixth Circuit] has also noted that 'the application of the *Younger* rule is much more than the mechanical application of these considerations.'" *Air Evac EMS, Inc. v. Robinson*, 486 F. Supp. 2d 713, 718 (M.D. Tenn. 2007) (quoting *Zalman v. Armstrong*, 802 F.2d 199, 201–02 (6th Cir. 1986) (reminding courts to be sensitive to the "concerns which animate [the *Younger*] rule, e.g., equity, comity and federalism")). "The underlying concern of *Younger* is the 'threat to our federal system posed by displacement of state courts by those of the National Government.'" *Doe v. Lee*, No. 3:20-CV-00610, 2020 WL 4926607, at *3 (M.D. Tenn. Aug. 21, 2020) (quoting *Moore v. Sims*, 442 U.S. 415, 423 (1979)). Therefore, "*Younger* abstention requires the federal court to defer to the state proceeding." *Id.* (quoting *Coles v. Granville*, 448 F.3d 853, 865 (6th Cir. 2006)).

### III. ANALYSIS

In this case, Mr. Davis's amended complaint asserts malicious-prosecution claims[5] under federal law and state law based on allegations that the affidavits used to secure his arrest warrants for both the aggravated-assault charge and the resisting-arrest charge included false statements. (Doc. 15, at 12.) The amended complaint, however, fails to allege that the entire "criminal proceeding" against Mr. Davis has been resolved in his favor. While the aggravated-assault charge has been dismissed, the resisting-arrest charge has been bound over to a grand jury and remains pending. (Doc. 21-1; Doc. 21-2.) As a result, there remains an ongoing state judicial proceeding implicating important state interests and in which there is an adequate opportunity to raise the argument that the resisting-arrest charge was not supported by probable cause. *See Sixth Angel Rescue, Inc. v. Schiliro*, 596 F. App'x 175 (3d Cir. 2015) (affirming district court's dismissal of malicious-prosecution claim without prejudice under *Younger* while underlying criminal prosecution remained pending); *see also Thomas v. Louisville-Jefferson Cnty. Metro Gov't*, No. 3:18-cv-41, 2019 WL 1099794, at *2–*3 (W.D. Ky. Mar. 7, 2019) (finding that an individual's malicious-prosecution claim under the Fourth Amendment had not accrued when trial court vacated the individual's underlying conviction but the prosecution appealed because the matter had not reached a "final termination"). Therefore, *Younger* counsels that the Court should abstain from unnecessarily interfering with Mr. Davis's ongoing state

---

[5] To state a malicious-prosecution claim under 42 U.S.C. § 1983 when the claim is based on a violation of the Fourth Amendment, a plaintiff must allege: (1) a criminal prosecution was initiated against the plaintiff and that the defendant made, influenced, or participated in the decision to prosecute; (2) there was a lack of probable cause for the criminal prosecution; (3) as a consequence of the legal proceeding, the plaintiff suffered a deprivation of liberty apart from the initial seizure; and (4) the criminal proceeding was resolved in the plaintiff's favor. *See Sykes v. Anderson*, 625 F.3d 294, 308–09 (6th Cir. 2010).

criminal prosecution. Accordingly, the Court will dismiss Mr. Davis's malicious-prosecution claims without prejudice pursuant to the abstention doctrine announced in *Younger*.[6]

IV. **CONCLUSION**

Based on principles of abstention, this action will be **DISMISSED WITHOUT PREJUDICE**.[7]

**AN APPROPRIATE JUDGMENT WILL ENTER.**

/s/ *Travis R. McDonough*
**TRAVIS R. MCDONOUGH**
**UNITED STATES DISTRICT JUDGE**

---

[6] Federal courts are nonetheless permitted to intervene in situations where *Younger* abstention would otherwise apply "in cases of proven harassment or prosecutions undertaken by state officials in bad faith without hope of obtaining a valid conviction . . . ." *Perez v. Ledesma*, 401 U.S. 82, 85 (1971). There are no allegations of proven harassment in this case and the body-cam videos do not suggest that Dudley and King sought arrest warrants for Davis without hope of obtaining a valid conviction. Accordingly, the Court finds that this exception to *Younger* abstention does not apply.

[7] Nothing in this Court's memorandum opinion should be construed as foreclosing refiling of this action upon resolution of Mr. Davis's resisting-arrest charge. Additionally, the Court expresses no opinion as to whether Mr. Davis can assert a malicious-prosecution claim based on dismissal of the aggravated-assault charge independent of favorable resolution on his resisting-arrest charge.